# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00221-CV

**Morris Mitchell Robinson, Ward, Appellant**

**v.**

**Glenda E. Willingham, Appellee**

### FROM THE COUNTY COURT OF RUNNELS COUNTY
### NO. 64A, HONORABLE MARILYN EGAN, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Morris Mitchell Robinson challenges the county court's appointment of Glenda E. Willingham as the permanent guardian of his person and estate. Robinson contends that the evidence is insufficient to demonstrate that he needs a guardian. He also contends that the court erred by overruling his motion for new trial because new evidence submitted with the motion would have changed the result. We affirm the judgment.

At the time of the hearing in December 2004, Robinson was seventy-nine years old. He and his wife have no children. Willingham is his wife's niece. Willingham described herself as having a close family relationship with Robinson for more than fifty years. In recent years, she provided care to Robinson and his wife. In January 2003, Mr. Robinson executed a durable power of attorney to Willingham. He testified that their relationship began to deteriorate soon thereafter. After Mrs. Robinson was incapacitated by Alzheimer's disease, Willingham was appointed her

guardian. Robinson attempted to divide the community estate between himself and his wife and Willingham. Willingham and her husband testified that Robinson became potentially dangerous to those around him and uncharacteristically impulsive, especially with money.

Robinson's driving also deteriorated. The Willinghams recounted numerous accidents and near collisions during 2003 and 2004, including an incident in which he drove under an eighteen-wheeler from the side with his wife as a passenger. Ollema Rose, the Department of Public Safety employee who has administered driver's tests in Runnels County since 1994, testified that Robinson failed three driving tests that she administered at the request of a DPS officer. She testified that he started each test sharply and well, unlike most drivers who make errors early because of nervousness, but that his attention wandered and he would commit violations.

Robinson started loaning or giving money and property to women he had only recently met. The money and property were not repaid or returned. One woman allegedly forged checks withdrawing a total of $21,666.43 from the Robinsons' account beginning in late 2003. The bank refunded the money paid on forged checks, but Robinson later paid an attorney to represent the forger. Jerry Willingham, Glenda's husband, testified that the bank asked Robinson to move his account and the sheriff's office considered presenting charges against Robinson to the grand jury. Robinson also obtained over $26,000 in cash advances using his GM card over a seven-month period from late March through late October 2004—sometimes getting several in one day, incurring $3150 in cash-advance fees for 210 transactions in seven months. (Even if the relevant period is restricted to six months before the hearing, he engaged in more than 110 transactions in that period.) When he met one of the women to lend her $50, she became angry at him over an unrelated issue, threw

his keys into a ditch, and drove away in her own car leaving him stranded. Robinson loaned a truck to another woman who kept it longer than he intended her to have it. He reported the truck stolen, but was charged with making a false report when the nature of the transaction was revealed. The charge against him was pending at the time of this guardianship hearing and the truck was still missing.

Willingham testified that, on more than one occasion, Robinson left his invalid wife unattended. He left her in soiled diapers occasionally, sometimes inserting a paper towel as a lining rather than changing the diaper. Willingham testified that, although she provided food and Robinson obtained meals outside the home, some of those meals went uneaten and spoiled in the refrigerator.

In October 2004, Robinson strongly objected when Willingham moved his wife to a nursing center. He asserted that he had a shotgun and that he and his wife would die before moving to a nursing home. Robinson did not actually have a shotgun at the time because Willingham had, on advice, removed Robinson's firearms from the house. Robinson later asked Jerry Willingham to take a shotgun to the nursing home and leave it in Mrs. Robinson's closet. The director of the nursing home testified that Robinson has interfered with persons providing services to his wife at the nursing home, being verbally abusive and, at one point, shoving one of them. The nursing home now requires that Robinson be accompanied when he visits.

Robinson denied or tried to explain some of the behaviors described. He testified that he left his wife alone only for short periods of time while she was sleeping. He acknowledged the traffic accidents and the additional spending. Robinson said he drove when he needed to drive and no one could take him where he wanted to go. He said that he gave money to help women who

3

convinced him they were in need of money for their children or their house payments. He considered some of the transactions loans, though none of the funds were repaid. Robinson said he had not known about the transaction fee for cash advances from his GM card account.

The parties submitted competing expert reports at the hearing on the application to appoint a guardian. Willingham submitted a certificate of medical examination and medical reports by Dr. Russell Dickerson, M.D., a neurologist, and Robinson submitted a report by Dr. Jarvis Wright, a psychologist.

Dr. Dickerson examined Robinson in September 2004 and diagnosed him as having mild dementia based on reports of five motor vehicle accidents in a year, trouble forming memories, and reports of increasingly impulsive behavior. Robinson testified that he spent about forty-five minutes with Dr. Dickerson. After an office visit on November 2, 2004, Dr. Dickerson diagnosed Robinson with probable Alzheimer's disease based in part on an MRI showing mild to moderate atrophy in his brain. In his physician's certificate of medical examination for guardianship dated November 10, 2004, Dr. Dickerson wrote that Robinson's impulsive behaviors showed very poor judgment. Dr. Dickerson certified that Robinson was partially incapacitated, finding him capable only of handling funds of less than fifty dollars. He was unsure whether Robinson could make informed voting decisions or apply for and receive government benefits. Dr. Dickerson opined that Robinson was unable to perform several tasks, including driving safely, making decisions regarding travel, contracting and incurring obligations, managing property or making gifts or disposition of property, handling a bank account, or making decisions regarding financial obligations.

4

Dr. Wright disagreed with Dr. Dickerson's assessment. On December 3, 2004, Dr. Wright interviewed Robinson for three hours, then had lunch with him. Dr. Wright described Robinson's conversation as logical and coherent. Robinson discussed his personal history, named several famous political persons and entertainers when asked, performed simple arithmetic, interpreted proverbs, and made reasonable responses to hypothetical situations. Robinson told Dr. Wright that he had managed his own finances before the temporary guardianship. Robinson also drove to lunch with minimal instruction. The lunch visit was an opportunity for Dr. Wright to observe Robinson in real-life situations including driving, even though Robinson had officially lost the right to drive pursuant to the temporary guardianship order of October 11, 2004. Dr. Wright concluded, based on this contact, that Robinson was oriented to his time, place, and situations in his life. Dr. Wright found only age-appropriate deterioration in Robinson's mental and physical accuity, and opined that a guardianship was not appropriate.

The court made findings and conclusions required for the creation of a guardianship. The court found Robinson partially incapacitated, and concluded that he needed a guardian and that his best interests were served by the appointment of Willingham, who would protect his rights and property. The court also found that Willingham was not ineligible to be Robinson's guardian, that Robinson lacked full capacity to provide for himself and manage his affairs, and that Dr. Dickerson's certificate of medical examination adequately stated the extent of Robinson's incapacity. The court essentially froze Robinson's investment portfolio valued at more than $300,000, permitting Willingham to draw up to eight percent of the available funds for Robinson's benefit.

Robinson raises two issues on appeal. First, he challenges the sufficiency of the evidence to support the appointment of a guardian. As a part of that challenge, he contends that we cannot consider Dr. Dickerson's certificate because Robinson did not waive physician-patient privilege regarding his examination. Second, Robinson contends that the county court erred by denying his motion for new trial.

We review both the appointment of a guardian and the consideration of a motion for a new trial for an abuse of discretion. *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984) (new trial); *Saldarriaga v. Saldarriaga*, 121 S.W.3d 493, 497 (Tex. App.—Austin 2003, no pet.) (guardian). A trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

We examine the court's exercise of discretion in appointing a guardian against a statutory framework that includes requirements that certain elements be proven by particular, differing levels of proof. Courts may appoint guardians for persons who are not minors according to the circumstances and considering the best interests of the proposed wards. Tex. Prob. Code Ann. § 677(a) (West 2003). Before appointing a guardian, the court must find by clear and convincing evidence that (1) the proposed ward is incapacitated, (2) the proposed ward's best interest is served by having the court appoint a guardian for the ward, and (3) the appointment of a guardian will protect the proposed ward's rights and property. *See* Tex. Prob. Code Ann. § 684(a) (West 2003). The court also must find by a preponderance of the evidence that the court has venue of the case, that the person to be appointed guardian is eligible to act as guardian and is entitled to appointment, and

6

that either the proposed ward is totally without capacity to care for himself and to manage his property or he lacks the capacity to do some, but not all, of the tasks necessary to care for himself or to manage his property. *Id*. § 684(b). The need for a guardian must be "evidenced by recurring acts or occurrences within the preceding six-month period and not by isolated instances of negligence or bad judgment." *Id*. § 684(c). Legal and factual sufficiency claims are not independent, reversible grounds of error, but are factors to consider in assessing whether the trial court abused its discretion. *Trimble v. Texas Dep't of Prot. & Reg. Servs.*, 981 S.W.2d 211, 215 (Tex. App.—Houston [14th Dist.] 1998, no pet.) (citing *IKB Indus. Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 445 (Tex. 1997)).

The clear and convincing standard of proof falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *Trimble*, 981 S.W.2d at 217. Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. *Id*.; *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979). The clear-and-convincing standard alters somewhat our review of the legal and factual sufficiency of the evidence. *In re J.F.C.*, 96 S.W.3d 256, 265-67 (Tex. 2002).

In a legal sufficiency review, a court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id*. at 266. We must assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so. A corollary to this requirement is that a court should disregard all evidence that a reasonable fact finder could have

7

disbelieved or found to have been incredible.  *Id*.  But a court need not disregard all evidence that does not support the finding.  Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.  *Id*.; *see also City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex. 2005).  If, after conducting its legal sufficiency review of the evidence, a court determines that no reasonable fact finder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient.  *J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, a court of appeals must give due consideration to evidence that the fact finder could reasonably have found to be clear and convincing.  *Id*.; *see also In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).  The inquiry is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the allegations.  *See C.H.*, 89 S.W.3d at 25.  We must consider whether disputed evidence is such that a reasonable fact finder could not have resolved that disputed evidence in favor of its finding.  "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient."  *J.F.C.*, 96 S.W.3d at 266.

**Guardianship**

Before assessing the sufficiency of the evidence, we address Robinson's argument that Dr. Dickerson's certificate of medical examination is not within the scope of our review. Robinson argues that the certificate and accompanying reports are inadmissible because he did not waive physician-patient privilege in writing.  *See* Tex. R. Evid. 509, 510.  Robinson failed to

8

preserve this asserted error. He did not object when Willingham offered Dr. Dickerson's certificate and reports at the guardianship hearing. Instead, his attorney stated that he and opposing counsel agreed that their respective experts' records would be admitted without proof of their business-record nature. Robinson's attorney then stated, "[W]e have no objection to the introduction of the documents." Finding no assertion of physician-patient privilege at the trial, we will consider the record presented to the county court. *See* Tex. R. App. P. 33.1.

The determination challenged for factual and legal sufficiency is that Robinson is incapacitated. The statute provides in relevant part that a person is incapacitated when, "because of a physical or mental condition, [he or she] is substantially unable to provide food, clothing, or shelter for himself or herself, to care for the individual's own physical health, or to manage the individual's own financial affairs . . . ." Tex. Prob. Code Ann. § 601(14)(B) (West Supp. 2005).

There was evidence that Robinson's ability to care for himself and to manage his financial affairs was impaired and was not likely to improve. The key evidence is the diagnosis and certificate of Dr. Dickerson, the neurologist. Dr. Dickerson diagnosed Robinson as having mild dementia and Alzheimer's disease with a guarded/poor prognosis that rendered him partially incapacitated to govern his own affairs. Dr. Dickerson filed a certificate of medical examination in which he concluded that Robinson is incapable of performing tasks and making crucial decisions. *See* Tex. Prob. Code Ann. § 687(a) (West Supp. 2005) (certificate of medical examination required before creating guardianship).

Other evidence also supported finding incapacity. Robinson had five wrecks in the year before the hearing and his erratic driving nearly caused others. He continued to drive even after

a court terminated his driving privileges, raising questions about his judgment. Robinson began dispersing thousands of dollars to women he had recently met, some of whom misrepresented their intentions and needs. He persuaded his bank to refund thousands of dollars paid on checks forged by one woman, then paid a lawyer to defend the accused forger on the charges, causing repercussions with the bank and potentially with law enforcement. Robinson was charged with filing a false report for telling police that a truck was stolen by a woman to whom he had loaned the truck. His 210 cash withdrawals in seven months—often more than one in a day—incurred transaction fees that he claimed he was not aware were charged. He threatened to kill his wife and himself rather than let either of them be placed in a nursing home, and he asked Jerry Willingham to leave a gun in the closet in his wife's room at the nursing home. He interfered with nursing home employees providing care to his wife, yelling at them and pushing one of them, causing the nursing home to bar him from visiting unaccompanied. The Willinghams testified that these impulsive behaviors and angry outbursts were marked changes for Robinson.

Robinson introduced contravening evidence. Robinson explained the expenditures as attempts to help needy people who may have taken advantage of him. He violated no court orders or other restrictions by giving the money away. Dr. Wright reported that Robinson was logical and coherent and had little trouble driving to lunch at an unfamiliar restaurant. Dr. Wright detailed a series of topics discussed and tests administered that persuaded Dr. Wright that Robinson did not need a guardian. In every examination, Robinson was described as oriented to his time and place. He denied having hallucinations or getting lost, and there is no contradictory evidence. Jerry

10

Willingham conceded that anger was an understandable response to Robinson's wife being taken to a nursing home against his will.

We conclude that the evidence, when viewed within the strictures of our standard of review, is sufficient to support the trial court's conclusion that Robinson is incapacitated within the meaning of the probate code. *See* Tex. Prob. Code Ann. §§ 601(14)(B), 684. The court observed Robinson as he testified. The court also considered documentary evidence, lay witness testimony, and competing expert reports. The court, as fact finder, could reasonably choose to accept the opinion of Dr. Dickerson, a licensed physician who filed a certificate of medical examination pursuant to the probate code, instead of the opinion of Dr. Wright, a psychologist who filed a psychological evaluation. Driving examiner Rose's testimony about Robinson's inability to maintain focus throughout the extended driving tests illustrates that Robinson's incapacity may manifest itself intermittently, potentially explaining both his lapses in judgment and the inconsistent assessments of his capacity.

Dr. Dickerson's diagnosis is supported by the aggregation of Robinson's uncharacteristic and risky behaviors such as bad driving, unusual and excessive spending, and physically manifested anger. Robinson's inability to manage his financial affairs is underscored by his asserted unawareness of the transaction fee on cash advances on his GM card, despite the fact that his account statements show the $15 fee was assessed 210 times in a seven-month period. The evidence in this record could produce a firm belief in a reasonable fact finder that a physical or mental condition has rendered Robinson substantially unable to manage his own financial affairs and has somewhat impaired his ability to protect his own physical well-being. *J.F.C.*, 96 S.W.3d at 266.

11

We cannot say that the evidence opposing the finding is so significant that a fact finder could not reasonably have formed a firm belief that Robinson is incapacitated. *Id*.

**Motion for new trial**

Robinson contends that the county court abused its discretion by denying his motion for new trial based on newly discovered evidence. The evidence at issue is the report by Dr. Carlos Escobar, a physician who examined Robinson on December 28, 2004—more than two weeks after the guardianship hearing. After examining Robinson, Dr. Escobar concluded that Robinson is not incapacitated. The court denied the motion.

A party seeking a new trial on the ground of newly discovered evidence must show the trial court that: (1) the evidence has come to his knowledge since the trial; (2) it was not owing to the want of due diligence that it did not come sooner; (3) it is not cumulative; and (4) it is so material that it would probably produce a different result if a new trial were granted. *Jackson v. Van Winkle*, 660 S.W.2d 807, 809 (Tex. 1983), *overruled on other grounds by Moritz v. Preiss*, 121 S.W.3d 715 (Tex. 2003).

The evidence is not newly "discovered" because it was created after the hearing. There is no explanation of why Robinson did not obtain Dr. Escobar's opinion before the hearing. Instead, Robinson's attorney attached an affidavit expressly stating that he and Robinson decided after the hearing that Robinson needed to be examined by a licensed psychiatrist to assess his capacity. The court announced its decision at the December 10, 2004 hearing and signed its orders on January 7, 2005. Although Dr. Escobar examined Robinson on December 28, 2004 and dated his certificate of medical examination on December 29, 2004, Robinson did not file the certificate

or his motion for new trial until February 4, 2005. The county court did not abuse its discretion by denying the motion for new trial based on this evidence created after the decision was announced at the hearing and introduced after the order was signed. *See Sifuentes v. Texas Employers' Ins. Ass'n*, 754 S.W.2d 784, 787 (Tex. App.—Dallas 1988, no writ).

The record contains legally and factually sufficient evidence from which the county court could reasonably conclude that Willingham showed by clear and convincing evidence that Robinson was partially incapacitated. The court did not abuse its discretion either by appointing a guardian or by denying Robinson's motion for new trial. We affirm the appointment of the guardian.

_____

G. Alan Waldrop, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   April 6, 2006

13